WILSON v. BABB.

1. A child born in lawful wedlock is presumed to be legitimate until the contrary be shown, even where born so soon after marriage that it could not have been lawfully begotten; but in such case, the evidence of illegitimacy is not required to be so strong as in other cases. This rule should be applied by the courts with a cautious regard to the peace of society and the happiness and reputation of families.
2. Any competent testimony bearing upon this question is admissible, and, if it satisfies the mind, is sufficient.
3. Impotency of the husband, impossibility of access, or cohabitation of the wife with another man, are not the only facts competent to establish the illegitimacy of a child born in wedlock.
4. A finding by the Circuit judge of the fact of the illegitimacy of a child born four and one-half months after marriage, sustained.

Before FRASER, J., Laurens, July, 1881.

Action for partition of a tract of land of which J. Newton Bolling died seized. Elizabeth Wilson and others, children of James and Lucinda Johnson, were plaintiffs, and the defendants

were, at first, Tandy M. Babb, administrator *de bonis non* of J. N. Bolling, and Amanda Bolling, widow; and after her death, Tandy Babb, as heir-at-law of the widow of J. N. Bolling, and the widow and children of Melmoth Babb. Tandy and Melmoth Babb were brothers, and only heirs-at-law of Mrs. Bolling. Mrs. Bolling survived her husband, and her brother, Melmoth, survived her. The brief gives no dates.

The testimony was as follows:

*Martin Arnold*—Am connected with the family; know Elizabeth Wilson, Sarah Monroe; they were acknowledged to be children of James Johnson and Lucinda Johnson; she was also the mother of Henry Johnson; Henry Johnson was a brother to petitioners; Henry Johnson and J. N. Bolling called each other brother.

✕.—Reside in Greenville county; Lucinda Johnson was the mother of Elizabeth Wilson and Sarah Johnson; never heard her claim to be the mother of J. N. Bolling; knew the parties for forty years; well acquainted with petitioners; Mrs. L. Johnson raised them.

*William Ellison*—I know Elizabeth Wilson and Sarah Monroe; they were said to be children of Lucinda Johnson; am connected with the family by marriage; knew J. N. Bolling; he was said to be a son of Lucinda Johnson.

✕.—Reside in Laurens county; it was said by neighbors and connections that J. N. Bolling was a son of Lucinda Johnson; Mrs. Perrit said, during her life, that J. N. Bolling was a son of Lucinda Johnson; Mrs. Perrit and Mrs. Johnson were sisters.

*Martin Arnold, recalled*—Know that Mrs. Perrit and Mrs. Johnson were sisters; J. N. Bolling was raised by old Mrs. Bolling.

✕.—Heard Mrs. Perrit and Mrs. Johnson say they were sisters; old Mrs. Bolling was the mother of Mrs. Johnson and Perrit.

*Wesley Latimer*—Know J. N. Bolling; heard him say that

Lucinda Bolling was his mother; Lucinda Bolling was the
wife of James Johnson; heard Mrs. Isabella Latimer, my
former mistress, say that J. N. Bolling was taken from his
mother when very small; Mrs. Latimer and Mrs. Bolling were
closely connected after her marriage with Johnson; Mrs. John-
son had other children—Sarah, who married Monroe; Eliza-
beth, who married Wilson, and others.

X.—It was in Greenville county I saw Mr. Bolling, some
twenty-two or twenty-three years ago, when he told witness that
Mrs. Bolling was his mother; can't recall any other conversation
that then took place between them; frequently saw before-
mentioned at Mrs. Johnson's; they called her ma; Mrs. Latimer
said to witness, the child was carried away when very small,
but did not say where from.

*Josiah Sullivan*—I know J. N. Bolling; Lucinda Bolling
was his mother, who afterwards married James Johnson; did
not know the Johnson boys; when they were play-boys together,
heard J. N. Bolling say Lucinda Bolling was his mother; he
(Bolling) then lived at the old Bolling place.

X.—Knew J. N. Bolling well; were play-boys together;
witness is over seventy years old; saw Mr. Bolling frequently
after we grew up; did not know the Johnson boys; it was when
they were boys heard J. N. Bolling say Mrs. Bolling was his
mother.

*Phyllis Bolling*—I knew J. N. Bolling well; Lucinda Boll-
ing was his mother; was born after her marriage with James
Johnson; I knew both J. N. Bolling and his mother well.

X.—Witness belonged formerly to mother of Mrs. Bolling;
carried a letter from Esquire Dunklin to James Johnson, saying
he would take the child and its mother too; I carried the child
to my home at Mrs. Abby Bolling's, but the mother stayed; I
have heard J. N. Bolling say Mrs. Lucinda Johnson was his
mother; he was then a good-sized boy; have heard Mrs. John-
son say J. N. Bolling was her son; Mr. Johnson is dead;
witness was not at Mr. Johnson's for several days after the
birth of the child.

×× .—Witness went for the child; got it at Mr. Johnson's house, and from the bed with Mrs. Johnson; Mrs. Johnson said it was her child, but that Mr. Johnson would not allow her to "suckle" it; witness raised the child at Mrs. Abby Bolling's; lived with him after he was grown; saw him after death; and knew him to be the same J. N. Bolling.

*Mrs. Ann H. Sullivan* — Knew Newton Bolling and his mother; Bolling was born, I think, in 1808 or 1809; his mother was then married to James Johnson; I knew Elizabeth, daughter of James and Lucinda Johnson; she married John Wilson; and Sallie, another daughter, married Francis Monroe; did not know the other children; am not related to Newton Bolling; knew his grandmother; lived near her and visited her; Lucinda was at my house several times.

× .—Lucinda was never married, except to James Johnson; about time of Newton's birth, I saw Phyllis carrying the child to his grandmother's, Mrs. Abigail Bolling; and also heard Mrs. Kinman, the midwife, speak of the circumstances of his birth about 1808 or 1809.

*Nathaniel Gaines*—Knew J. N. Bolling; report said he was son of Lucinda Bolling, born after her marriage with James Johnson.

× .—My recollection is, that James Johnson and Lucinda Bolling were married in the latter part of the summer or early fall of 1809; about four and a half months after, the child, J. N. Bolling, was born; recollect the date from the fact that my (witness) father died November 6th of that year; recollect the birth from the fact, as reported then, that Mrs. Kinman, the midwife, on that occasion, attempted to pacify Mr. Johnson by telling him that four and a half months for himself, and four and a half months for his wife, made the full nine months; was familiar with the Bolling family from a short time before said marriage; do not recollect to have heard said family, or Johnson, or his wife, speak of the child; was frequently at James Johnson's in 1809 and 1810; was there a few weeks after the birth of said child; did not, at any time, see the child or hear

the family speak of him; my father and Johnson's mother were brother and sister; I have heard the Johnsons speak of the birth of the child, and his removal by order of James Johnson; I never saw or heard of the child, J. N. Bolling, being at Johnson's, or having any communication whatever with his family; never heard Johnson say why said child was taken away;· from frequent visits, I know the child was not nurtured by his mother, and was never recognized as a member of the Johnson family.

×  ×.—Knew the Bolling family from shortly before said marriage; saw James Johnson and Lucinda Bolling on one occasion at a neighborhood gathering, but did not see them associating together.

FOR DEFENSE.

*Tandy Babb*—Am acquainted with defendant; is his sister; she married Josiah N. Bolling; I have heard members of the Bolling family speak of Josiah N. Bolling; it was said by them that he was a son of James Dunklin; I have frequently heard Maj. T. C. Bolling (cousin of Josiah N. Bolling, and nephew of Lucinda Bolling,) say that James Dunklin was the father of the said J. N. Bolling, and was so recognized by the whole family, and there was a striking resemblance between them; the Bolling family regarded J. N. Bolling illegitimate; I never saw James Johnson; J. N. Bolling, my brother-in-law, never recognized the Johnsons as his family.

×.—Josiah N. Bolling lived in Laurens county; married Amanda Babb, my sister, the defendant in this case; was never married but once.

*Amanda Bolling*—Was the wife of Josiah N. Bolling; never heard him speak of himself as the son of James Johnson; have heard him frequently say he was not; Josiah N. Bolling showed me a house, and said his father lived there, and his name was James Dunklin; does not know that Lucinda Bolling was ever married.

*Phyllis Bolling*—Knew Lucinda Bolling well; lived on same plantation with her; four or five months after her marriage, the

child, J. N. Bolling, was born; the mother kept the child some three days after birth, before it was sent away; Mrs. Johnson sent the child away because Mr. Johnson would not allow it to remain; would not allow her to "suckle" it; because, as he said, it wasn't his child; frequently heard the Bolling family say James Dunklin was the father of the child.

X.—Josiah N. Bolling was the son of Lucinda Johnson; witness lived with Bolling family before said parties were married; saw them married; Johnson came courting a very short time—perhaps three months.

*B. Gunnels*—I have heard Mary Perrit and her husband say that James Dunklin did not deny, but said there was no doubt but that he was the father of Josiah or Newton Bolling; Mary Perrit was a sister of Lucinda Johnson.

*Andrew McKnight*—Thornberry Bolling said to me that Josiah N. Bolling was an imperfect child, and he intended to give all his property to him and one other; said James Dunklin was his father; I heard Samuel Bolling speak of James Dunklin as the father of the child, and fought on the subject; I have heard James Dunklin say that he was the father of J. N. Bolling; J. N. Bolling has said more than once, in my presence, that James Dunklin was his father, and that Dr. Irby Dunklin was his half-brother; Thornberry Bolling was uncle of J. N. Bolling.

*Mrs. Ann H. Sullivan*—Knew Lucinda Bolling and others of Bolling family; never heard her mention Newton's name nor his father's, nor say who was his father; the wife and daughters of Lucinda's brother often spoke in my presence, and said that Newton's father was Lucinda's brother-in-law, James Dunklin, and censured both for such conduct; this was over fifty years ago; Lucinda was never married before she married James Johnson; Newton was born four or five months afterwards; saw the baby at my father's when Phyllis was carrying it to Mrs. Bolling; have heard Mrs. Kinman, the midwife, say that James Johnson would not suffer his wife to keep the child, Newton, who could not have been more than two weeks old when taken

from his mother; never heard James Johnson speak of Newton or claim to be his father, or deny it; heard the wife of Lucinda's brother say that James denied being the father; the child was removed because James denied being the father; and this was the reason given by the Bolling family; never heard Newton claim any one for his father.

It was conceded that the declarations of divers persons as to the illegitimacy of Josiah N. Bolling were the declarations of persons deceased at the time of trial. The plaintiffs, at the taking of the testimony and on the trial, objected in turn to any and all testimony directed to showing that anybody else than James Johnson either was, or was believed to be, the father of Josiah N. Bolling, or that James Johnson denied being the father of Josiah N. Bolling, or that Lucinda's family connection regarded Josiah N. Bolling as the child of any other person than James Johnson.

The Circuit decree was as follows:

This case was heard by me at the extra term of the court for Laurens county in July, 1881. The questions involved are somewhat new in this State, and deserve more consideration than can be given to them by a Circuit judge. I shall, therefore, state my conclusions very briefly.

The action is brought for the partition of a tract of land, the property of J. Newton Bolling, deceased, who died intestate, leaving surviving him a widow, Amanda Bolling, but no children or other lineal descendants. The plaintiffs claim that they are the brother and sister and the representatives of a deceased brother and sister, and entitled to one-half of the land. The defendants claim that they are the representatives of the widow, now deceased, and entitled to the whole tract of land, basing their claim upon the alleged illegitimacy of J. Newton Bolling, deceased.

I have examined the testimony and find nothing to show any relationship between any of the plaintiffs and the intestate, except Elizabeth Wilson and Sarah Monroe. If there is any such evidence it has escaped me. As to these two, the only evidence

E

is that they were regarded and perhaps treated as the children of James and Lúcinda Johnson, who were husband and wife. This, however, is sufficient if J. Newton Bolling was a legitimate child of the same parents.

The evidence is clear that Lucinda Johnson, whose maiden name was Bolling, about four and a half or five months after her marriage with James Johnson, gave birth to a son; that this son was sent off by James and Lucinda Johnson, within two or three days after his birth, to the mother of Lucinda Johnson; was nursed by a colored woman, and never afterwards became a member of the family of James and Lucinda Johnson; that from declarations of various persons, relatives of the family, some now dead, he was regarded as the son of one Esquire Dunklin, a brother-in-law of Lucinda. The same kind of evidence, on which Elizabeth Wilson and Sarah Monroe base their claim to being the legitimate children of James and Lucinda Johnson in the case, assigns an illegitimate birth to the intestate. He did not bear the name of Johnson, but Bolling, the maiden name of his mother, and not a single witness says that he ever was regarded as legitimate. The fact that James Johnson was visiting Lucinda as a suitor for some three months before marriage is not, in my judgment, such access as to affect him with the charge of having improper relations with her, in the absence of any circumstances to show that such a condition of things then existed between them.

The intestate was born in 1808 or 1809, and the evidence is such as must be relied on in these cases. I think that as a matter of fact, the intestate, J. Newton Bolling, was an illegitimate child of Lucinda Johnson, and that the evidence is sufficient to remove any presumption of legitimacy arising from the fact that he was born four and a half or five months after the marriage of his mother. It is, therefore, ordered and adjudged that the complaint be dismissed with costs.

The plaintiffs appealed upon the exception stated in the opinion, and also upon the following:

2. Because, upon the facts proved, the presiding judge on the

circuit ought to have decreed that J. N. Bolling was in law a child of James Johnson.

3. Because, it having been proved that J. N. Bolling was born in lawful wedlock, the presiding judge on the circuit ought to have decreed that according to the evidence the alleged illegitimacy of J. N. Bolling was not proved.

4. Because the said J. N. Bolling and the plaintiffs having been born in lawful wedlock, the plaintiffs are entitled to a share of the estate of J. N. Bolling.

*Mr. W. C. Benet,* for appellants.

Marriage is proof of paternity, and the old maxim of the civil law, *pater est quem nuptiae demonstrant,* subject to certain exceptions, is still the approved dogma. *Fraser's Parent and Child* 1, 62. Impotency of the husband and his absence from the realm were once the only exceptions. But the rule was extended to include proof of non-access. *Strange* 925; 1 *Sim. & S.* 153; 2 *Kent* 211–212; 2 *Greenl. Ev.* 145. Another exception is open cohabitation of the wife with a paramour. 5 *Car. & P.* 604. See, further, 2 *Phil. Ev.* (*Cow. & H.*) 488, *note* 379, 314, *note* 305; *Steph. Dig. Ev.* 159; 5 *Wait Ac. & Def.* 48; *Schoul. Dom. Rel.* 308. The husband here was not impotent nor *extra quatuor maria,* and there is not "perfectly satisfactory proof" that he had no access at time of the conception; and this is necessary. 2 *Kent* 21, *note* 5; 1 *Turn. & R.* 138; 6 *How.* 580; *Schoul. Dom. Rel.* 306; *Reeve Dom. Rel.* 270; 3 *Car. & P.* 215, 425; 2 *Munf.* 442; 1 *S. C.* 85; 15 *Id.* 421; 5 *Id.* 411; 3 *Allen* 148; 3 *Paige* 139; 1 *Desaus.* 595; 2 *Bay* 480; 10 *Rich.* 66; 1 *Ad. & E.* 444; 1 *Bish. Mar. & D.,* § 435; see particularly *Stegall* v. *Stegall,* 1 *Brock.* 256, which is directly in point. There is no satisfactory proof here of non-access by the husband. There is no proof of open cohabitation with another man; only vague rumors of an illicit intercourse with Dunklin—a scandal that arose after the birth of the child. This case is unlike *Shuler* v. *Bull,* 15 *S. C.* 421. But adulterous intercourse with another man—short of open cohabitation—is not sufficient. *Shelf. M. & D.* 711; 2 *Myl. & K.* 349. These rules apply, equally, to ante-nuptial generation. *Shelf. M. & D.* 797; 2

*Munf.* 442 ; 1 *Brock.* 256. The declarations of husband and wife were inadmissible. 5 *Car. & P.* 604 ; 3 *Phil. Ev.* 1555 ; 22 *Md.* 337 ; 1 *Allen* 209 ; 75 *Ill.* 315 ; 2 *Greenl. Ev.*, § 151. Hearsay is admissible on questions of pedigree, only where it proceeds from persons proved *aliunde* to be relatives of the family. 1 *Phil. Ev.* 230–236 ; 1 *Greenl. Ev.*, § 103 ; 1 *Whart. Ev.*, §§ 201, 216 ; 2 *Russ. & M.* 166 ; 2 *Best Ev.* 845 ; 3 *Wall.* 187 ; 6 *Wall.* 642.

*Mr. James Farrow*, same side.

*Mr. J. W. Ferguson*, contra.

As appellants here claim collaterally, a question of pedigree is involved. On questions of pedigree, declarations of deceased persons connected with the family are admissible. 3 *Bouv. Inst.*, § 3071 ; 1 *Greenl. Ev.* 103 ; 3 *Phil. Ev.* 287 ; 3 *Stark. Ev.* 1100 ; 4 *Campb.* 401 ; 10 *Pet.* 434. As to the extent of such evidence, see 3 *Stark. Ev.* 1114–1117 ; 3 *McC.* 230, and cases cited. A child born in wedlock is not necessarily lawful. 8 *East* 204 ; 1 *S. C.* 87 ; 15 *Id.* 421. It is not necessary to prove impossibility of access—authorities *supra*, and *Whart. & S. Med. Jur.*, § 302 ; 4 *T. R.* 358 ; 1 *Phil. Ev.* 433 ; 3 *Id.* 288. Presumption of access does not arise before marriage as during coverture. The marriage, during pregnancy, raises no presumption unless the woman was so far gone as to make it apparent. *Whart. & S. Med. Jur.*, § 302 ; 8 *East* 207 ; 1 *Chit. Bl. Com.* 458 ; see, too, 3 *Stark. Ev.* 1100.

August 9th, 1882. The opinion of the court was delivered by MR. CHIEF JUSTICE SIMPSON. Josiah Newton Bolling died intestate in 18—, seized and possessed of certain real estate situate in Laurens county. He left a widow, but no lineal descendants. The plaintiffs commenced this action for the partition of his lands, claiming to be heirs-at-law with the widow. Their right to this partition involved the question of the legitimacy of the deceased. During the pendency of the action, the widow died, and the present defendants were made parties as her heirs-at-law. Considerable testimony was taken, whether orally

before the Circuit judge, or before some officer of the court, does not appear in the brief. It was taken, however, and is set out in full.

Judge Fraser, who heard the case, found, as matter of fact, that the deceased was the illegitimate child of Lucinda Johnson, the mother of the plaintiffs, and, upon this finding, he dismissed the complaint with costs. The plaintiffs have appealed, and the question which the appeal requires us to consider is, whether the judge erred in this finding. The case before us is a case in chancery, and is embraced within the appellate jurisdiction of this court, so that, although the appeal involved a question of fact almost entirely, yet it is within our cognizance, subject to the principles heretofore decided as to such appeals.

A legitimate child is he that is born in lawful wedlock, or within a competent time afterwards. 1 *Blacks. Com.* 367. "*Pater est quem nuptiae demonstrant*" is the rule in the civil law, says Mr. Blackstone, and this holds with the civilians, whether the nuptials happens before or after the birth of the child. In England, and in this country, however, the nuptials must be precedent to the birth, and while a post-nuptial birth is not conclusive upon the question of legitimacy, yet it raises a presumption which will stand until overthrown by sufficient and competent testimony. At one time, in the early history of such cases, nothing short of proof of impossibility of access, on the part of the husband, was regarded as sufficient to destroy this presumption. But such is not the law now. It now stands as any other question of fact, resting upon the testimony for and against it. *Shuler* v. *Bull*, 15 *S. C.* 421, and the cases there cited; *State* v. *Shumpert*, 1 *S. C.* 85.

While a legitimate child is one born in lawful wedlock, and a bastard is one begotten and born out of lawful wedlock, yet it does not follow that every child born in lawful wedlock is legitimate, nor does it require one to be both begotten and born out of lawful wedlock to be a bastard. The true test is whether the husband of the woman who gives birth to the child is its father; and this must, of necessity, in every case, be a question of fact. Where the child is born after lawful wedlock, and after the lapse of the usual period of gestation, it should require

a very strong state of circumstances to overthrow the presumption of legitimacy, such as impossibility of access, absolute non-access, abandonment, or something equally as conclusive. But where the birth is so soon after the marriage as to render it certain, according to the laws of nature, that the child could not have been begotten during the wedlock, then it is more of an open question, depending on the weight of the testimony, aided in favor of the legitimacy, somewhat, by the marriage, but, perhaps, not to the extent of requiring such strong opposing evidence as in other cases. In every case, however, the question is still one of fact, to be determined in each special case by the principles hereinabove stated : to be administered and applied by the courts with a cautious regard to the peace of society and the happiness and reputation of families.

Judge Fraser, after a careful consideration of the testimony submitted to him, came to the conclusion that the deceased was illegitimate, and refusing the claim of those who never recognized their now alleged relationship to the deceased until after his death, and his property had become subject to partition, turned the property over to the heir of his widow, who, notwithstanding his *bar sinister*, had, in the face of it, and against all attendant reproach, united her destiny with his in early life, and had stood by him until his death. There is some justice in this result at least. But the question for this court to determine is, whether the decree of Judge Fraser can stand.

The first ground of appeal claims that J. N. Bolling, having been born of the wife of James Johnson after marriage, the law requires said Bolling to be considered and treated in the distribution of his estate as a child of James Johnson until the contrary be established by competent testimony, which must be either—First, impotency of the husband ; Second, impossibility of access between husband and wife ; or, Third, birth of the child during or within a competent time after the mother's cohabitation with some other man than her husband. It is true that birth during lawful wedlock presumes legitimacy which will stand until the contrary be established by lawful testimony ; and if this ground had stopped at the first paragraph it would have been unobjectionable. But we know of

no law which requires the proof of either one or all of the facts mentioned in the specifications as indispensable to the overthrow of this presumption. Either one of these facts will certainly have that effect; but there is no authority for saying that they are indispensable, one or all.

We have examined the cases relied upon by the appellants, and have extracted from them the principles as laid down above. In most of these cases the birth of the child took place during the coverture and within a competent time thereafter for the husband to have been the father during said coverture; and even in those cases, the presumption was not regarded as conclusive. Nor did they indispensably require the presence of the facts mentioned in this ground to overthrow it. The rules established in the *Banbury Peerage Case,* 1 *Sim. & S.* 153, were in reference to questions applicable to cases of a like character to those above referred to. These rules hold the presumption rebuttable by such facts and circumstances as are sufficient to prove to the satisfaction of the jury that no sexual intercourse took place between the husband and wife at a time when, by such intercourse, the husband, by the laws of nature, could be the father of such child.

The true doctrine, sustained by all of these cases, is found in 1 *Phil. Ev.* (*C. & H.'s notes*) 630, where he says: "If a child be born after the marriage of the mother and during the husband's life, it is presumed to be legitimate. It was formerly an established doctrine of the courts that this presumption in favor of legitimacy could not be rebutted, unless the husband was incapable of procreation, as from impotency, or old age, or was absent beyond the seas during the whole period of the wife's pregnancy. This doctrine was not, however, conformable to the more ancient legal authorities, but in later times it came to be established that the presumption in favor of legitimacy of the child of a married woman might be rebutted if it were shown that the husband had not opportunity for sexual intercourse within such a period of time before the birth of the child as would admit of his being the father. And, in the present day, even where a husband and wife have had opportunities for sexual intercourse at a time when the husband might have

become the father of the child, a court and jury are at liberty to infer from all the circumstances of the case that no sexual intercourse took place. But when a jury believes that sexual intercourse took place between husband and wife at a time when it might have led to the conception of the child whose legitimacy is disputed, it would seem that they ought not to find the child a bastard. If, however, there was an opportunity of access, though the wife was notoriously living in adultery, it does not necessarily follow that the child is not legitimate."

These principles, as it appears from the terms employed by Mr. Phillips, were intended to apply to cases of adulterine bastardy, and their effect is to throw the protection of a very strong presumption in such cases around the legitimacy—so strong as to cast the burden of destroying it on the party impeaching it; which, however, when assumed, may be done by any competent testimony sufficient to satisfy the mind of the tribunal before whom the question is made, to the contrary. This certainly is the law in this State since the cases of the *State* v. *Shumpert* and *Shuler* v. *Bull, supra.*

Whether this protecting principle applies as strongly to antenuptial conception and birth afterwards, as in this case, the authorities are not very definite. In the case of *Wright* v. *Hix,* 12 *Geo.* 162, Judge Lumpkin thought it applied whether the bastardy originated before or during the marriage. " If a man," says he, " marries a woman pregnant by another person, the law presumes the child to be the husband's; and whether she was at the time a reputed virgin or *grossment enceinte,* the books make no difference. In both cases the law says, presumably, it is his child; still he may show, by whatever proof he may command, that he has been made the innocent victim of fraud and artifice. And the same proof may be adduced by any one whose interest and right it is to contest the legitimacy of the pretender; and inexpressibly hard would it be if such privilege was not allowed." But whatever doubt there may be as to where the burden of proof lies in any case, the authorities are uniform as to the character of the evidence which may be submitted. Any competent testimony bearing upon the question is admissible, and, if it satisfies the mind, it is sufficient.

Now, how does Judge Fraser's finding of fact stand when examined by the light of these principles and tested by the rules heretofore established as to appeals involving questions of fact in chancery cases? Is there an absence of all testimony to sustain that finding? Or, even, is the manifest weight of the testimony against it? We think both of these questions should be answered in the negative. We find, in the decree, the substance of the testimony stated in a condensed form, and presented so as to show its full force. It is as follows: [Here follows the statement of the evidence contained in the Circuit decree, *supra.*] It was further in testimony that James Johnson became a suitor of Lucinda about three or four months before the marriage, and, on one occasion before, at a neighborhood gathering, they were both present, not, however, associating with each other. The only testimony on the other side was the fact that the birth took place during coverture. There was no evidence that this birth was premature. In the face of these facts, we cannot say that there was an entire absence of testimony to support the finding of the Circuit judge, nor that the weight of the evidence is against it.

It is the judgment of this court that the judgment of the Circuit Court be affirmed.

MR. JUSTICE McGOWAN absent at the hearing.